IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| WENDY GUIDA, in her capacity as mother to and as trustee for the next of kin of Andrew Stratton, deceased,<br><br>Plaintiff,<br><br>v.<br><br>CASS COUNTY, NEBRASKA; ELLIOT SCHMIDT; KARL BOEHM; and MIKE MCKNELLY,<br><br>Defendants. | 8:24CV56<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on defendants Cass County, Nebraska (the "county"), Elliot Schmidt ("Schmidt"), Karl Boehm ("Boehm"), and Mike McKnelly's ("McKnelly" and collectively, the "defendants") Motion for Summary Judgment (Filing No. 30) pursuant to Federal Rule of Civil Procedure 56.[1] The county is a Nebraska political subdivision. Schmidt, Boehm, and McKnelly (the "officers") are sued individually and in their official capacities as Cass County Deputy Sheriffs during the key events in this case (Filing No. 1).

Plaintiff Wendy Guida ("Guida"), who sues in her capacity as mother to and trustee for the next of kin of Andrew Stratton ("Stratton"), unsurprisingly opposes summary

---

[1]The complaint and summons name "Elliot Schmidt" as a defendant (Filing Nos. 1, 4, 11). The answer (Filing No. 13) uses both "Schmidt" and "Schmit" interchangeably without explanation. Though the instant motion and notarized affidavit consistently use "Schmit"—which should presumably be correct—the Court continues to use "Schmidt" because that is what is in the operative pleading. No one has moved to address the ostensible misnomer either through a motion to dismiss or motion to amend. *See* Fed. R. Civ. P. 12, 15; *Roberts v. Michaels*, 219 F.3d 775, 777-78 (8th Cir. 2000) (discussing "the well-recognized distinction between a complaint that sues the wrong party, and a complaint that sues the right party by the wrong name").

judgment (Filing No. 37). She argues genuine disputes of material fact require a jury trial. For the reasons stated below, the motion is granted in part and denied in part.

I. BACKGROUND[2]

The facts of this case are undeniably tragic. On February 13, 2022, "Stratton was experiencing a psychiatric crisis" at the home he shared with his father, Gregg Stratton ("Gregg"), in Alvo, Nebraska. Previously "diagnosed with paranoid schizophrenia," Stratton "was not taking his prescribed medication."

That evening, Gregg called 911 to report that his son hit him in the face during an argument. After the altercation, Gregg left his home to call 911 from his mother's house in Greenwood, Nebraska. He notified the dispatcher that Stratton, who lived in his basement, was not taking his medication and was acting erratically. Despite reassurances from the dispatcher, Gregg was concerned for Stratton's safety. He requested that the responding officers talk with Stratton and place him in Emergency Protective Custody, rather than arrest him.

The officers responded to Gregg's report and went to Stratton's home. Based on the information they received, they believed they had probable cause to arrest Stratton for

---

[2] The underlying facts are primarily drawn from the parties' respective statements of fact (Filing Nos. 31, 38, 46). Any properly supported material facts that are not disputed with pinpoint citations to the record are deemed admitted. *See* Fed. R. Civ. P. 56(e) (explaining the effect of failing to properly support or address a fact); NECivR 56(b)(1) (requiring a "concise response" that includes "pinpoint references" to the record); *Tramp v. Associated Underwriters, Inc.*, 768 F.3d 793, 799 (8th Cir. 2014) (stating material facts are "properly considered . . . admitted" if not disputed as required by Rule 56). Unsupported factual statements carry no weight. *See Rodgers v. City of Des Moines*, 435 F.3d 904, 908 (8th Cir. 2006) (refusing to "mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments").

assault. Gregg gave permission to enter the home to search for Stratton, warning them that although all firearms were locked in a safe,[3] he might have access to a bow and arrows.

The officers entered the darkened home on the first floor and soon learned Stratton was in the basement. Schmidt and Boehm had positioned themselves at the top of the stairs leading to the basement when Schmidt began trying to persuade Stratton to come up to talk with them. Their goal was to take him "into custody for assaulting" Gregg. The entire exchange was "captured on the officers' bodycams."

Schmidt "repeatedly and calmly asked [] Stratton to come out of the basement to discuss the situation with the officers." Stratton refused to come up and told the officers to leave, confirming that he had a bow and arrows. His "responses were combative, threatening, and often delusional"—telling officers he had killed Osama bin Laden and had a nuclear weapon.

As Schmidt spoke with Stratton, McKnelly went outside to watch the basement exit door. The Nebraska State Patrol was also contacted to provide support.

After Schmidt and Stratton spoke for about twelve minutes, Stratton stopped responding. Schmidt and Boehm then heard a sound from the basement they thought might be a door shutting. Schmidt decided to move down the stairs "to better assess the situation." Armed with an assault rifle, he was followed by Boehm, "who had his Taser in his hand, so he was prepared to deploy non-lethal force." The lights in the basement were off, leaving only the light from Schmidt's flashlight.

As they descended the stairs, Schmidt reportedly believed he again heard a sound like a door closing, followed by "a sound similar to a gun safety being clicked off." According to Schmidt, he thought that "Stratton might have fallen in the dark basement

---

[3]McKnelly later discovered a shotgun in a closet in the mudroom on the main level.

3

and hurt himself, so he continued down the steps to see if [he] was hurt." As "he reached the bottom of the stairs," Schmidt surveyed the dark basement with his flashlight. He found "Stratton standing in the doorway of a utility room about thirty feet down a hallway." Schmidt saw Stratton "pointing a bow with a nocked arrow at him." The arrow dipped as if "Stratton's hand slipped" as he drew the string back but then came back up and pointed right at Schmidt again.

Schmidt reacted to the "threat of lethal force by firing his weapon a number of times in rapid succession." Hit by multiple bullets, Stratton went down. Although the officers quickly administered first aid, Stratton died almost immediately. After the shooting, the officers located Stratton's compound bow and arrows and a knife.

Questioning their need to go downstairs, Guida denies the officers faced "an immediate physical threat." As she sees it, they failed to follow protocol, ignored available non-lethal alternatives, and escalated the situation unnecessarily.

On February 12, 2024, Guida filed this action for damages pursuant to 42 U.S.C. § 1983. In Count I, she asserts claims against the officers based on violations of the Fourth and Fourteenth Amendments to the United States Constitution. In Counts II and III, respectively, she alleges the county is liable under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), based on its inadequate policies, customs, and practices, and *City of Canton v. Harris*, 489 U.S. 378, 380 (1989), based on its failure to properly train the officers.

On March 10, 2025, the defendants moved for summary judgment, arguing Guida "cannot prove an intentional violation of a clearly established Constitutional right and Defendants are shielded by qualified immunity." Guida counters "that genuine disputes of material fact exist regarding the alleged violation of [] Stratton's Fourth Amendment rights, the use of excessive force, and the [d]efendants' failure to properly handle a mental health crisis." The defendants' motion is now fully briefed and ready for decision.

## II. DISCUSSION

### A. Standard of Review

On a motion for summary judgment, the Court views any genuinely disputed evidence in the light most favorable to the nonmovant and draws all reasonable inferences in their favor. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *Grinnell Mut. Reinsurance Co. v. Dingmann Bros. Constr. of Richmond, Inc.*, 34 F.4th 649, 652 (8th Cir. 2022). In a qualified-immunity case, "that usually means adopting . . . the plaintiff's version of the facts," unless they are "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007); *see also Aden v. City of Bloomington*, 128 F.4th 952, 960 (8th Cir. 2025) (noting "the entire exchange was captured on video, providing undisputed facts"). But the Court will not resort to speculation, *see Redlich v. City of St. Louis*, 51 F.4th 283, 286 (8th Cir. 2022), nor "credit mere allegations, unsupported by specific facts or evidence," *Onyiah v. St. Cloud State Univ.*, 5 F.4th 926, 930 (8th Cir. 2021) (quoting *Williams v. United Parcel Serv., Inc.*, 963 F.3d 803, 807 (8th Cir. 2020)).

Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Green v. City of St. Louis*, 134 F.4th 516, 522 (8th Cir. 2025) (concluding "[s]ummary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that" standard is met (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)). "A fact is 'material' if it may 'affect the outcome of the suit.'" *Erickson v. Nationstar Mortg., LLC*, 31 F.4th 1044, 1048 (8th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A factual dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Strategic Energy Concepts, LLC v. Otoka Energy, LLC*, 120 F.4th 1339, 1342 (8th Cir. 2024) (quoting *Anderson*, 477 U.S. at 248). "A complete failure by the non-moving party 'to make a showing sufficient to establish the existence of an element essential to that party's case . . . necessarily renders all other facts immaterial.'" *Walz v. Ameriprise Fin.,*

5

*Inc.*, 779 F.3d 842, 844 (8th Cir. 2015) (ellipses in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

### B. No Standing

As noted above, Guida states she is suing under § 1983 as Stratton's mother and as trustee for his next of kin. That raises some questions. *See*, *e.g.*, *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014) ("Our cases make it clear that 'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.'" (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969))); *Longoria v. Pinal County*, 873 F.3d 699, 711 (9th Cir. 2017) ("Only [the decedent's] estate may bring a § 1983 for the violation of his Fourth Amendment rights; his family members have no standing to sue on their own behalves."); *Yellow Horse v. Pennington County*, 225 F.3d 923, 926 (8th Cir. 2000) (discussing standing issues related to survival and wrongful-death actions under § 1983); *Frey v. City of Herculaneum*, 44 F.3d 667, 670 (8th Cir. 1995) (analyzing § 1983 standing though "[n]either party raised the issue").

To start, § 1983 is silent as to whether a decedent's parent can bring a civil-rights action on his behalf based on the alleged constitutional violations that purportedly caused his death. *See id.*; *Robertson v. Wegmann*, 436 U.S. 584, 588-89, 594 (1978); *Est. of Guled ex rel. Abdi v. City of Minneapolis*, 869 F.3d 680, 683 (8th Cir. 2017) (explaining "§ 1983 does not make clear who constitutes the injured party when the injured party dies"). Given that silence, courts generally have looked to 42 U.S.C. § 1988 and state law to determine whether such a claim exists and decide who is the proper plaintiff. *See Robertson*, 436 U.S. at 589-90 (explaining that state survivorship statutes provide "the principal reference point in determining survival of civil rights actions" unless they contradict the Constitution or federal law); *Est. of Guled*, 869 F.3d at 683 (looking to state law to decide who was the proper plaintiff); *Frey*, 44 F.3d at 670-71 (explaining "that whether a civil rights claim under section 1983 exists is determined by the state's law governing survival of actions").

6

The party bringing an action under § 1983 "bears the burden of demonstrating that a particular state's law authorizes" the cause of action they assert "and that the plaintiff meets that state's requirements for bringing" it. *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998); *Andrews v. Neer*, 253 F.3d 1052, 1064 (8th Cir. 2001) (concluding the plaintiff had standing under the state wrongful-death statute to bring a § 1983 claim based on her father's death); *Yellow Horse*, 225 F.3d at 926 (concluding the administrator of the decedent's estate had standing to bring a survival action under § 1983). Guida has not met that burden.

Though neither party addresses it, Nebraska law provides two distinct causes of action for wrongful-death and a survival action. *See In re Est. of Panec*, 864 N.W.2d 219, 225 (Neb. 2015) (clarifying the two causes "are conceptually separate" even if "frequently joined in a single action"); Neb. Rev. Stat. §§ 30-809 (wrongful death), 25-1401 (survival). An action for wrongful death is brought on behalf of a surviving spouse "and next of kin for damages they have sustained as a result of the decedent's death," including "the pecuniary value of the loss of the decedent's support, society, comfort, and companionship." *In re Est. of Panec*, 864 N.W.2d at 225; Neb. Rev. Stat. § 30-810. In contrast, a survival action under § 25-1401 continues the decedent's own right of action that he possessed before death. *In re Est. of Panec*, 864 N.W.2d at 225. It "is brought on behalf of the decedent's estate and encompasses the decedent's claim for predeath pain and suffering, medical expenses, funeral and burial expenses, and any loss of earnings sustained by the decedent, from the time of the injury up until his or her death." *Id.* Importantly, both causes of action are brought by the decedent's personal representative. *See id.*; Neb. Rev. Stat. § 30-810 (requiring actions under § 30-809 to "be brought by and in the name of the" decedent's court-appointed "personal representative for the exclusive benefit of the widow or widower and next of kin"); *accord Moreland*, 159 F.3d 369-70 (noting Nevada state law extended "the right to bring a survival action only to the official representatives of an individual's estate," making no mention of "a similar right extending to family members or heirs to bring a survival action independent or in lieu of the estate's claim").

7

Here, Guida's § 1983 claim in Count I appears to include elements of both causes of action. She seeks damages based on the violation of his rights and his pain and suffering as well as her own pecuniary losses and loss of consortium. But she does not even allege, let alone adduce evidence, that she has been formally appointed as the personal representative of Stratton's estate or is otherwise authorized to bring her claims individually or as "trustee" for Stratton's next of kin. *See, e.g.*, *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1054 (9th Cir. 2018) (noting the plaintiff's claims "could have been asserted by a" properly appointed personal representative); *Hayes v. County of San Diego*, 736 F.3d 1223, 1229 (9th Cir. 2013) (concluding that a plaintiff that claimed to be the decedent's "sole surviving heir" failed to allege she was her father's personal representative or otherwise had standing to assert survival claims based on his constitutional rights); *Est. of Johnson by Castle v. Vill. of Libertyville*, 819 F.2d 174, 177 (7th Cir. 1987) (concluding parents lacked standing to sue under § 1983 where decedent's spouse brought claims as the properly appointed administrator of her estate).

In other words, Guida has not shown she has standing to raise her § 1983 claims based on the alleged violations of Stratton's constitutional rights. *See Moreland*, 159 F.3d at 370 (concluding the mother and minor children of a man fatally shot by police lacked standing to assert a survival claim under § 1983). As for any potential § 1983 claim Guida might have raised in her individual capacity based on alleged violations of her own federal or constitutional rights, she not has not articulated such claim. *See, e.g.*, *Andrews*, 253 F.3d at 1064 (noting the plaintiff "did not bring a separate claim for injury to her own constitutional rights").

C.   **Qualified Immunity**

Even if Guida had established standing to raise her § 1983 claims, those claims would still fall short. *See Anderson*, 477 U.S. at 251-52 (explaining the ultimate question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). The defendants assert they "are entitled to summary judgment because [Guida] cannot prove

8

an intentional violation of a clearly established Constitutional right and [the defendants] are shielded by qualified immunity." The Court agrees.

"Qualified immunity shields officials from civil liability in § 1983 actions when their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Morgan v. Robinson*, 920 F.3d 521, 523 (8th Cir. 2019) (en banc) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). It "'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)); *accord Furlow v. Belmar*, 52 F.4th 393, 404 (8th Cir. 2022). "To avoid pretrial dismissal, a plaintiff must present facts showing the violation of a constitutional right that was clearly established at the time of the defendant's act." *Irvin v. Richardson*, 20 F.4th 1199, 1204 (8th Cir. 2021).

Guida primarily challenges Schmidt's use of deadly force, arguing the officers violated his Fourth Amendment rights.[4] In evaluating that claim, the Court must consider "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "Whether the force used was objectively unreasonable—and, thus, constitutionally excessive—is a legal question," not a factual one. *Aden*, 128 F.4th at 957, 959; *see also Tlamka v. Serrell*, 244 F.3d 628, 632 (8th Cir. 2001) ("Once the predicate facts are

---

[4]In her complaint only, Guida briefly mentions the Fourteenth Amendment, and in one paragraph states, "It was a violation of Stratton's Fourth and Fourteenth Amendment Rights for Schmidt, Boehm and McKnelly not to render mental health aide prior to forcing a violent confrontation." She neither provides any support for that claim in her brief nor makes any argument beyond her general statements about alternative courses of action with regard to her excessive-force claim. The Court considers any such claim abandoned. *See Mickelson v. County of Ramsey*, 823 F.3d 918, 932 (8th Cir. 2016) (explaining that a party abandons a claim by failing to argue it before the district court).

established, the reasonableness of the official's conduct under the circumstances is a question of law.").

Properly assessing reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The Court must judge "[t]he 'reasonableness' of a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*; *accord Schulz v. Long*, 44 F.3d 643, 649 (8th Cir. 1995) ("Alternative measures which 20/20 hindsight reveal to be less intrusive (or more prudent), such as waiting for a supervisor or the SWAT team, are simply not relevant to the reasonableness inquiry.").

Applying those principles here, the Court agrees with the defendants that Schmidt did not use excessive force under the circumstances. *See Aden*, 128 F.4th at 959 ("It is reasonable for an officer to use deadly force if he has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others." (quoting *Rogers v. King*, 885 F.3d 1118, 1121 (8th Cir. 2018))). Based on the information Gregg provided and what they learned at the scene, the officers had probable cause to arrest Stratton for striking Gregg and reasonably feared he presented a serious threat to their safety. They knew Stratton was not taking his medication and was acting erratically. When they spoke with Stratton, trying to get him to come upstairs, he confirmed he was armed with a bow and arrows and threatened them.

As Schmidt and Boehm descended into the basement, Schmidt saw Stratton drawing down on him with a deadly weapon. At that point, Stratton—apparently poised to make good on his threat—posed an imminent threat of death or serious injury to Schmidt and Boehm. "[F]orced to make split-second judgment[]—in circumstances that [were] tense, uncertain, and rapidly evolving—about" how to respond to that threat, it was not

10

objectively unreasonable for Schmidt to fire his weapon. *Graham*, 490 U.S. at 397; *see also Aden*, 128 F.4th at 960 (concluding "the use of lethal force was objectively reasonable" where the decedent "reached for a loaded gun and began to raise it").

As for Boehm and McKnelly, Guida has not alleged any actions related to the fatal shooting that would support an excessive-force claim against either of them. *See*, *e.g.*, *White v. Jackson*, 865 F.3d 1064, 1081 (8th Cir. 2017) ("To prevail on a § 1983 claim, a plaintiff must show each individual defendant's personal involvement in the alleged violation."); *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986) (explaining that a defendant can only be held liable for a constitutional violation under § 1983 if their actions caused the constitutional violation).

Convinced the circumstances did not justify the officers' actions, Guida focuses on Stratton's mental illness and "whether alternative tactics were available or feasible." In support, she relies on what she sees as violations of Cass County Sheriff's Office Standard Operating Procedure G-65 (Filing No. 44). But none of that precludes qualified immunity in these circumstances. *See*, *e.g.*, *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 615-16 (2015) (stating that a plaintiff "cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided" or on an officer's purported failure to follow their training, even if an expert (or plaintiff's counsel) thinks the officer's conduct was imprudent, improper, or reckless) (quotation omitted); *Quinones v. City of Edina*, 77 F.4th 1192, 1196 (8th Cir. 2023) (concluding that even if the officers should have known the decedent was mentally disturbed, it did not undermine "the conclusion that the officers . . . acted reasonably"); *Cole v. Bone*, 993 F.2d 1328, 1334 (8th Cir. 1993) (noting the pertinent issue under § 1983 "is whether the government official violated the Constitution or federal law, not whether he violated the policies of a state agency").

"The Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead

whether the seizure actually effectuated falls within a range of conduct which is objectively 'reasonable' under the Fourth Amendment." *Schulz*, 44 F.3d at 649. Here, it did. *See Kong v. City of Burnsville*, 960 F.3d 985, 993 (8th Cir. 2020) (clarifying that mental illness "does not reduce the immediate and significant threat a suspect poses" and concluding that failing to follow "training and department policy [that] advised that 'taking no action or passively monitoring the situation may be the most reasonable response to a mental health crisis'" did "not itself negate qualified immunity . . . so long as a reasonable officer could have believed that his conduct was justified'" (quoting *Sheehan*, 575 U.S. at 616)). Even if—as Guida suggests—Schmidt and Boehm "created the danger they later used to justify deadly force" by trying to disarm and arrest Stratton while he was experiencing a psychiatric crisis, "the reasonableness of force depends on the threat the person poses during the shooting." *Id.* at 993-94.

The officers certainly "might have chosen another course of action." *Aden*, 128 F.4th at 959. And—in hindsight—Guida may be right that a different choice might have better addressed the situation and prevented this tragedy. But the officers' actions in the difficult circumstances of this case were objectively reasonable and thus did not violate Stratton's constitutional rights. *See id.* They are entitled to qualified immunity. *See id.*

Though not a matter of immunity, Guida's failure to show that the officers violated Stratton's constitutional rights also precludes her § 1983 claims against the county. *See, e.g.*, *Stearns v. Wagner*, 122 F.4th 699, 704 (8th Cir. 2024) ("Because [the plaintiff's] constitutional rights were not violated, his *Monell* claim fails.").

In light of the foregoing,

IT IS ORDERED:
1. Defendants Cass County, Nebraska, Elliot Schmidt, Karl Boehm, and Mike McKnelly's Motion for Summary Judgment (Filing No. 30) is granted in part and denied in part.

2. This case is dismissed without prejudice for lack of subject-matter jurisdiction.

3. A separate judgment will issue.

Dated this 23rd day of June 2025.

BY THE COURT:

*[signature]*

Robert F. Rossiter, Jr.
Chief United States District Judge